UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 15-20096-CR-SCOLA

UNITED STATES OF AMERICA

v.

EVELYN LARA,

        **Defendant.**
_____ /

### STIPULATED FACTUAL PROFFER

The United States of America and EVELYN LARA (hereinafter referred to as the "defendant"), hereby agree that, if this case were to go to trial, the United States would establish the following facts beyond a reasonable doubt:

1. Beginning in around October, 2004, and continuing through in or around May, 2007, in Miami-Dade and Palm Beach Counties, in the Southern District of Florida, the defendant did willfully, that is, with the intent to further the object of the conspiracy, and knowingly conspire, combine, confederate, and agree with the defendants RAUL ENRIQUE QUINTANA ("RAUL QUINTANA"), MAURA BARBOSA LOPES, formerly known as "Maura Quintana" ("MAURA QUINTANA"), ARMALDO ALMEIDA PRADO NETO ("ARNALDO PRADO"), LUIS ENRIQUE SOSA ("LUIS SOSA"), JUAN OSIEL GONZALEZ ("JUAN GONZALEZ"), and other persons known and unknown to the Grand Jury, to knowingly, and with intent to defraud, execute and cause the execution of a scheme and artifice to defraud one or more financial institutions, including Chevy Chase Bank, F.S.B., JP Morgan Chase Bank, N.A., and Washington Mutual Bank, F.A., which scheme and artifice would employ a material falsehood, and to

knowingly and with intent to defraud, execute, and cause the execution of, a scheme and artifice to obtain moneys and funds owned by, and under the custody and control of one or more financial institutions, by means of false and fraudulent pretenses, representations, and promises relating to a material fact, in violation of Title 18, United States Code, Sections 1344(1) and (2).

### The Scheme and Artifice

2. It was the purpose of the conspiracy for the defendant and her co-conspirators to unlawfully enrich themselves by, among other things, misleading and defrauding lending institutions, and diverting fraudulently obtained loan proceeds for their personal use and benefit and to further the fraud scheme.

3. Chevy Chase Bank, F.S.B. ("Chevy Chase Bank"), JP Morgan Chase Bank, N.A. ("JP Morgan Chase"), and Washington Mutual Bank, F.A. ("WaMu") (the "lenders") were financial institutions with offices located throughout the United States, including in the State of Florida, whose accounts were insured by the Federal Deposit Insurance Corporation ("FDIC").

4. Brickell Financial Corp. ("BFC") was a Florida corporation, with its principal place of business listed as 520 Brickell Key Drive, Suite 0-205, Miami, Florida 33131. RAUL QUINTANA was the President and a director of BFC.

5. Title Closing Partners of Brickell, LLC ("TCP") was a Florida limited liability company, with its principal place of business listed as 1000 Brickell Avenue, Suite 320, Miami, Florida 33131. MAURA QUINTANA was a manager of TCP. The defendant was an employee of TCP from approximately June, 2006 until approximately September 4, 2006. The defendant was a member of TCP from May 21, 2007 to September 4, 2007.

6. Cellular & Wireless Wholesale Corporation ("CWW") was a Florida corporation,

with its principal place of business listed at various times as: 848 Brickell Key Drive, Apartment 4204, Miami, Florida 33131; P.O. Box 227296, Miami, Florida 33122; and 8240 NW 30th Terrace, Miami, Florida 33122. LUIS SOSA was the President, Secretary, and a director of CWW.

7. RAUL QUINTANA, MAURA QUINTANA, ARNALDO PRADO, and an unindicted co-conspirator ("D.B.L.") purchased residential properties in Miami-Dade and Palm Beach Counties using mortgage loans that they falsely and fraudulently obtained through misrepresentations on loan applications and related documents, and further falsely and fraudulently obtained refinancing loans through misrepresentations on loan applications and related documents.

8. RAUL QUINTANA and MAURA QUINTANA prepared and caused to be prepared false and fraudulent mortgage loan applications and related documents, which they submitted and caused to be submitted to lenders, including Chevy Chase Bank, JP Morgan Chase, and WaMu. The loan applications and related documents contained false and fraudulent statements and representations relating to: the borrower's occupation of, or intent to occupy, the mortgaged property as a residence; the borrower's employment, income, and assets; the borrower's payment of earnest money deposits and cash-to-close; and other information that was material to the borrower's qualifications to borrow money from the lenders. The loan applications and related documents were used to induce the lenders to fund mortgage loans to finance the purchase of the properties or refinance the properties.

9. RAUL QUINTANA and MAURA QUINTANA submitted and caused to be submitted to lenders mortgage loan applications in the names of MAURA QUINTANA and

ARNALDO PRADO, which contained false and fraudulent declarations that MAURA QUINTANA and ARNALDO PRADO were employed by CWW and earning substantial salaries, when in fact they were not employed by CWW and not earning substantial salaries at CWW or otherwise.

10. RAUL QUINTANA and LUIS SOSA agreed to provide false and fraudulent verifications of employment for MAURA QUINTANA and ARNALDO PRADO in connection with their mortgage loan applications. LUIS SOSA agreed that when lenders contacted CWW, CWW personnel would provide false and fraudulent verifications of the false and fraudulent declarations that MAURA QUINTANA and ARNALDO PRADO were employed at CWW and earning substantial salaries from such employment.

11. RAUL QUINTANA and MAURA QUINTANA submitted to lenders mortgage loan applications, with themselves, ARNALDO PRADO, and D.B.L. as the applicants and borrowers, wherein they listed as assets bank account balances that were false and fraudulent, because: the bank accounts listed on the loan applications were fictitious; RAUL QUINTANA, MAURA QUINTANA, ARNALDO PRADO, and D.B.L. did not own the bank accounts; or the bank account balances were inflated. In some instances, RAUL QUINTANA and MAURA QUINTANA provided lenders with falsified bank account statements in support of the false and fraudulent declarations regarding the applicant's bank accounts.

12. In his capacity as an employee of Wachovia Bank, JUAN GONZALEZ provided lenders with false and fraudulent written verifications of deposit regarding various Wachovia Bank accounts that were listed as assets on mortgage loan applications submitted by RAUL QUINTANA, MAURA QUINTANA, and D.B.L.

13. BFC was a mortgage brokerage company that was wholly-owned and operated by RAUL QUINTANA. Under RAUL QUINTANA's direction, BFC served as the originating mortgage broker for the false and fraudulent loan applications that were submitted to lenders by the RAUL QUINTANA and MAURA QUINTANA. BFC received substantial broker's commissions for originating the mortgage loans the defendants falsely and fraudulently obtained from lenders.

14. TCP was controlled by EVELYN LARA, MAURA QUINTANA, and RAUL QUINTANA. TCP served as the closing agent for the mortgage loans the defendants falsely and fraudulently obtained from the lenders. The defendant served as TCP's authorized representative and was responsible for the preparation and execution of the HUD-1 Settlement Statements for the fraudulent mortgage loan transactions, and the disbursement of the loan proceeds in accordance with the HUD-1 Settlement Statements.

15. As a representative of TCP, the defendant prepared and signed HUD-1 Settlement Statements for mortgage loans to RAUL QUINTANA, MAURA QUINTANA, ARNALDO PRADO, and D.B.L., which falsely and fraudulently stated, among other things, that the borrower had supplied an earnest money deposit or cash-to-close payment.

16. At or near the time of closings, the defendant, MAURA QUINTANA, and RAUL QUINTANA caused TCP to fraudulently disburse the proceeds of fraudulently obtained mortgage loans even though the borrower had not paid the earnest money deposit or cash-to-close as represented on, and required by, the HUD-1 Settlement Statements. On at least one occasion, the defendant, MAURA QUINTANA, and RAUL QUINTANA used early-release mortgage loan proceeds to satisfy the borrower's cash-to-close obligation.

17. On at least one occasion, the defendant, MAURA QUINTANA, and RAUL QUINTANA misappropriated loan proceeds that were required to be paid at closing to satisfy a lender's prior mortgage on the property.

### Washington Mutual Bank loan to D.B.L.

18. On or about June 26, 2006, RAUL QUINTANA prepared or caused to be prepared an initial loan application by D.B.L., which was submitted to WaMu. The application was for a $1,837,500 mortgage loan to finance D.B.L.'s purchase of 5324 Fisher Island Drive from ARNALDO PRADO and MAURA QUINTANA. The loan application falsely and fraudulently declared that: D.B.L.'s gross monthly "base employment income" was $45,000; D.B.L. had paid a deposit in the amount of $10,000; and D.B.L.'s assets included the following Wachovia Bank account balances:

| Account Number (last four digits only) | Stated Balance |
|---|---|
| Account no. 7252 | $201,997 |
| Account no. 1217 | $158,287 |
| Account no. 5667 | $507,118 |

In fact: D.B.L.'s gross monthly income of $45,000 was falsely and fraudulent inflated by a material amount; D.B.L. had not paid any deposit; and the bank accounts listed on D.B.L.'s initial loan application did not exist.

19. On or about June 27, 2006, at the request of RAUL QUINTANA, JUAN GONZALEZ prepared a false and fraudulent Wachovia Bank verification of deposit for the fictitious bank accounts listed on D.B.L.'s initial loan application. RAUL QUINTANA submitted the verification or caused it to be submitted to WaMu, in support of D.B.L.'s loan application.

20. On or about July 14, 2006, RAUL QUINTANA prepared or caused to be prepared a

final loan application by D.B.L., which was submitted to WaMu. The final loan application contained the same false and fraudulent declarations set forth in the initial loan application.

21. The $1,837,500 loan from WaMu to D.B.L. closed on July 14, 2006. TCP served as the closing agent for the loan. WaMu wire-transferred the loan proceeds in the amount of $1,883,352.26 to TCP's escrow account no. 1481 at Wachovia Bank.

22. On or about July 14, 2006, the defendant prepared a HUD-1 Settlement Statement ("HUD-1") for the WaMu loan to D.B.L. The HUD-1 was signed by the defendant, MAURA QUINTANA, ARNALDO PRADO, and D.B.L. In the HUD-1, the defendant, MAURA QUINTANA, PRADO, and D.B.L. falsely and fraudulently declared that D.B.L. had paid a $10,000 deposit and approximately $565,843 cash at closing. Contrary to the HUD-1, D.B.L. did not pay any deposit or cash due at closing. Instead, the defendant, MAURA QUINTANA, and RAUL QUINTANA agreed that TCP would disburse the loan proceeds even though it had not received the deposit or cash-to-close required by the HUD-1.

23. The defendant knew that the payment and the source of the cash-to-close was material to WaMu's decision to advance the loan to D.B.L. Accordingly, the defendant employed a fraudulent artifice to create the false impression that D.B.L. paid the cash-to-close.

24. On July 14, 2006, the defendant transferred $1,190,794.30 of the loan proceeds to MAURA QUINTANA, by check no. 1058 drawn on TCP's Wachovia Bank escrow account no. 1481, payable to MAURA QUINTANA. MAURA QUINTANA deposited TCP's check no. 1058 in her Wachovia Bank account no. 9183 the same day.

25. On July 14, 2006, MAURA QUINTANA used the loan proceeds deposited in her account no. 9183 to purchase a Wachovia Bank cashier's check in the amount of $565,843 payable

to TCP. MAURA QUINTANA instructed Wachovia Bank staff to designate D.B.L as the "remitter" on the face of the cashier's check. That same day, MAURA QUINTANA deposited the check into the TCP escrow account no. 1481, to create the illusion that D.B.L. had paid the cash-to-close before the loan proceeds were disbursed.

26. The defendant knew that the loan applications, the verification of deposit, and the HUD-1 for the loan to D.B.L. were submitted to WaMu, and that they contained false and fraudulent information that was material to WaMu's decision to make the loan to D.B.L. She submitted the documents or caused them to be submitted to WaMu, for the purpose of defrauding, and to obtain money and funds from, WaMu.

### Chevy Chase Bank loan to Raul Quintana

27. On or about September 8, 2006, RAUL QUINTANA signed an initial loan application that was submitted to Chevy Chase Bank, for a $2,080,000 mortgage loan for his purchase of 4985 Stables Way, Wellington, Florida. In his initial loan application, RAUL QUINTANA falsely and fraudulently declared that: his gross monthly was $98,120, consisting of $92,000 of "base employment income," and $6,120 of net rental income from leases of 2533 Fisher Island Drive, 750 Collins Avenue, and 16473 N.E. 31st Avenue; he had paid an earnest money deposit of $10,000; and his assets included the following bank account balances:

| Wachovia Account No. | Stated Balance |
|---|---|
| Account no. 9183 | $224,116 |
| Account no. 3151 | $686,393 |
| No account number | $500,000 |

In fact: RAUL QUINTANA's employment income was inflated by a material amount; the stated net rental income and the account balances of $686,393 and $500,000 were fictitious; and he had not paid an earnest money deposit of $10,000.

28. RAUL QUINTANA and MAURA QUINTANA fabricated bank statements, which were submitted to Chevy Chase Bank, in support of RAUL QUINTANA's application for the $2,080,000 loan. RAUL QUINTANA and MAURA QUINTANA obtained actual bank statements for account no. 3151, which was BFC's account, and a Wachovia Bank account no. 9413 belonging to another person. The fabricated bank statements for account no. 3151 showed balances of approximately $686,000 and $669,000 for August and July, 2006. The fabricated bank statements for account no. 9413 showed balances of approximately $615,000 in July and June, 2006. In fact, the actual bank statements for account 3151 were altered to increase the monthly balances by $600,000. Similarly, actual the statements for account 9413 were altered to show RAUL QUINTANA as the account owner and to increase the monthly balances by $500,000.

29. The $2,080,000 Chevy Chase Bank mortgage loan for RAUL QUINTANA's purchase of 4985 Stables Way closed on or about November 13, 2006. TCP served as the closing agent for the loan.

30. On or about November 13, 2006, the defendant prepared a HUD-1 Settlement Statement for the Chevy Chase Bank loan to RAUL QUINTANA. The HUD-1 was signed by the defendant, RAUL QUINTANA, MAURA QUINTANA, and the sellers. In the HUD-1, the defendant, RAUL QUINTANA, and MAURA QUINTANA falsely and fraudulently declared that RAUL QUINTANA and MAURA QUINTANA had paid a $200,000 deposit and approximately $998,011.96 cash at closing. In fact, no deposit or cash-to-close was paid before or at the closing. Instead, the defendant, RAUL QUINTANA, and MAURA QUINTANA agreed that TCP would disburse the loan proceeds even though it had not received the deposit or cash-to-close required by

the HUD-1.

31. On November 15, 2006, the defendant caused TCP to wire-transfer $1,576,940.92 to the sellers, even though RAUL QUINTANA had not paid the $200,000 deposit or the cash-to-close required by the HUD-1.

32. On November 21, 2006, MAURA QUINTANA purchased a Wachovia Bank cashier's check in the amount of $328,108.56 payable to TCP, in partial satisfaction of $998,011.96 cash-to-close that should have been paid on November 13, 2006.

33. The defendant knew that the loan application, the fabricated bank statements, and the HUD-1 were submitted to Chevy Chase Bank, and that they contained false and fraudulent information that was material to the bank's decision to advance the $2,080,000 loan to RAUL QUINTANA. The defendant submitted the documents, or caused them to be submitted, for the purpose of defrauding, and to obtain money and funds from, Chevy Chase Bank.

### Washington Mutual Bank loan to Raul Quintana

34. On or about March 9, 2007, RAUL QUINTANA signed an initial loan application that was submitted to WaMu, for a $1,820,000 loan to refinance his property at 2533 Fisher Island Drive. In his loan application, RAUL QUINTANA falsely and fraudulently declared that his gross monthly income was $109,689.87, which included "base employment income" of $107,200/month ($1,284,000/year).

35. On or about May 15, 2007, RAUL QUINTANA signed a final loan application wherein he falsely and fraudulently declared that his gross monthly income was $117,204, including "base employment income" from BCF and Turbo Commander of $114,714.67. He also attached a signed schedule listing the following Wachovia Bank accounts as assets:

| Wachovia Account No. | Account Name | Stated Balance |
|---|---|---|
| Account no. 4940 | Raul Quintana | $218,499.82 |
| Account no. 9183 | Raul Quintana | $17,800.32 |
| Account no. 3384 | Turbo Commander | $46,292.73 |
| Account no. 3151 | Brickell Financial Corp. | $44,403.26 |

In fact, RAUL QUINTANA's gross monthly income and the stated account balances for account numbers 9183 and 3151 were materially inflated, and account no. 4940 did not belong to him.

36.     On or about March 7, 2007, at the request of RAUL QUINTANA, JUAN GONZALEZ prepared a false and fraudulent Wachovia Bank verification of deposit. The verification of deposit purported to be a computer screen display of RAUL QUINTANA's bank accounts, which falsely and fraudulently stated that the defendant owned account no. 4940, and that the account had a balance of $218,499.82. In fact, account no. 4940 belonged to a non-U.S. resident who did not know about the loan transaction. RAUL QUINTANA submitted or caused the fraudulent verification of deposit to be submitted to WaMu in support of his loan application.

37.     The $1,820,000 WaMu loan to RAUL QUINTANA closed on or about May 15, 2007. TCP served as the closing agent for the loan.

38.     On or about May 15, 2007, the defendant prepared a HUD-1 Settlement Statement for the $1,820,000 WaMu loan. The HUD-1 was signed by the defendant, RAUL QUINTANA, and MAURA QUINTANA. According to the HUD-1, RAUL QUINTANA and MAURA QUINTANA were supposed to pay approximately $49,413 cash at closing, and TCP was to disburse approximately $1,839,623 to WaMu to satisfy its prior mortgage on 2533 Fisher Island Drive.

39.     Contrary to the HUD-1, RAUL QUINTANA and MAURA QUINTANA did not pay any cash due at closing, and TCP did not disburse any of the loan proceeds to WaMu.

Instead, the defendant, RAUL QUINTANA, and MAURA QUINTANA agreed that the loan proceeds would be diverted to RAUL QUINTANA and MAURA QUINTANA for their own use and benefit.

40.     On May 16, 2007, WaMu wired the loan proceeds of $1,864,432.24 to TCP's escrow account at Wachovia Bank. The following day, May 17, 2007, the defendant and MAURA QUINTANA wire-transferred $1,126,623.48 in loan proceeds to RAUL QUINTANA's and MAURA QUINTANA's personal bank account no. 9183 at Wachovia Bank. Thereafter, RAUL QUINTANA and MAURA QUINTANA spent the diverted funds.

(continued)

41. The defendant knew that the loan applications and the verification of deposit were submitted to WaMu, and that they contained false and fraudulent information that was material to WaMu's decision to refinance 2533 Fisher Island Drive. The defendant submitted the documents, or caused them to be submitted, for the purpose of defrauding, and to obtain money and funds from, WaMu.

WIFREDO A. FERRER
UNITED STATES ATTORNEY

Date: 10/27/2015    By: _____
DWAYNE E. WILLIAMS
ASSISTANT UNITED STATES ATTORNEY

Date: 10/27/15    By: _____
JOSEPH S. ROSENBAUM, ESQ.
ATTORNEY FOR DEFENDANT

Date: 10/27/15    By: _____
MARIA A. DOMINGUEZ TRUJILLO, ESQ.
ATTORNEY FOR DEFENDANT

Date: 10/27/15    By: _____
EVELYN LARA
DEFENDANT